UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) HARMON D. YALARTAI, as Personal Representative of the Estate of GABRIEL VALARTAI, Deceased, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: CIV-23-1181-HE |
| (2) JESSE KIGHT, Individually and In his Official Capacity; | ) ) ) ) | |
| (3) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY; | ) ) ) ) | |
| (4) BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF OKLAHOMA, | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Harmon D. Yalartai, as Personal Representative for the Estate of Gabriel Yalartai ("Plaintiff") for his Complaint against the above-named Defendants, alleges and states as follows:

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. This Court has federal

1

question jurisdiction of this action pursuant to 28 U.S.C. § 1331.

2. The acts and/or omissions giving rise to the Plaintiff's claims arose in Oklahoma County, State of Oklahoma, which is within the confines of the United District Court for the Western District of Oklahoma.

3. Venue is appropriate pursuant to 28 U.S.C. § 1391.

4. All of the conduct of the Defendants alleged herein was within the exercise of state authority and under color of law within the meaning of 42 U.S.C. §1983.

## PARTIES

5. Plaintiff, Harmon D. Yalartai, is the Personal Representative for the Estate of Gabriel Yalartai ("Plaintiff"). On December 26, 2021, Gabriel Yalartai was confined in the custody of the Oklahoma County Jail, located in Oklahoma City, Oklahoma. Gabriel Yalartai was a citizen of Minnesota at the time of his death.

6. Defendant, Jesse Kight ("Kight"), at all the times relevant herein, was a detention officer employed by the Oklahoma County Detention Center ("OCDC") and/or all other defendants named herein. At all times relevant, Kight was acting under the color of law and within the course and scope of his employment with the OCDC and/or all other named defendants named herein.

7. At the times relevant herein, Defendant, Oklahoma County Criminal Justice Authority ("OCCJA"), had final policy-making authority to establish policies, procedures, practices and customs at the OCDC, including but not limited to the training of detention officers and establishing operating maintenance policies and procedures at

the OCDC.

8. OCCJA is engaged in the conduct complained of under color of law within the scope of their authority as a municipal trust.

9. Defendant, Board of County Commissioners for the County of Oklahoma ("BOCC"), is political subdivision charged with the additional administration of county governmental services in Oklahoma County, including but not limited to the OCDC.

10. At the time of the incident complained of herein, BOCC had final policy-making authority to establish funding and/or oversight regarding the operations, maintenance and staffing of the OCDC.

11. The policies, practices, and customs promulgated, created, implemented and/or utilized regarding medical care of sight checks regarding inmates represent the official policies and or customs of the OCDC.

## FACTUAL BACKGROUND

12. This action arises from an incident which occurred on or about December 26, 2021, at the Oklahoma County Detention Center.

13. Since its construction in 1991, the OCDC has been riddled with problems. Many of those issues, including but not limited to overcrowding, under-staffing, inadequate security and supervision, wide-spread unreasonable use of force by staff, and inadequate access to medical care and supervision, continue to threaten the health and well-being of inmates confined there today.

14. On July 31, 2008, the United States Department of Justice, Civil Rights Division (DOJ), concluded a more than five-year investigation into the OCDC to "ensure that conditions at the Jail meet federal constitutional requirements." (U.S. DOJ, Re: Investigation of the Oklahoma County Jail and Jail Annex, Oklahoma City, Oklahoma, July 31, 2008, p.1 (hereinafter "DOJ Report")).

15. The DOJ Report analyzed conditions at the OCDC in light of Fourteenth and Eighth Amendment standards (DOJ Report, p.3).

16. A copy of the DOJ Report was sent to Defendant BOCC via John Whetsel, in his official capacity as then acting Oklahoma County Sheriff in 2008. As such, Defendant BOCC was on notice and aware of the constitutional deficiencies addressed in the DOJ Report.

17. In 2012, the DOJ cited the OCDC for remaining short-staffed, utilizing outdated policies and procedures, and for the staff not being trained to detect and/or intervene in inmate medical emergencies and/or supervision.

18. In May of 2021, the National Institute of Corrections ("NIC") provided a report to the BOCC and OCCJA stating the following:

- There was an incomplete staffing plan;
- New hires received limited training;
- Present level of staffing was insufficient for a safe and secure jail;
- The jail's policy of "same day" hirings and failure to perform background checks on new hires was defective;
- The jail reduction in hiring requirements was defective;
- That it was "[i]mpossible to effectively manage inmate population when they [the OCDC] are so short-staffed";
- Officers were coming to work without proper training;

- In service training was out of date;
- The jail had a lack of policies and procedures for sight checks and medical care; and
- That OCCJA was informed that they needed to change to direct supervision as soon as possible to curb adverse events.

19. The OCCJA was created in 2020 to address these issues but has failed to implement any effective actions to address the short staffing and untrained staff member issues.

20. The BOCC has failed to provide appropriate oversight and funding for the OCDC since the date of the DOJ and NIC Reports.

21. In September 2021, District Attorney Prater requested a Grand Jury investigation into the jail's operations due to the ongoing and persistent issues.

22. One of the reviews identified the low level of pay for detention officers by the OCDC. This low pay, combined with the lack of training as identified by consultants leads to poor candidates and employees being in charge of maintaining what should be a safe jail.

23. Despite being aware of the unconstitutional conditions at the OCDC and pattern and practice amongst jailers in failing to perform adequate sight checks for inmates with known mental health issues, Defendants BOCC and the OCCJA deliberately disregarded the substantial risk of serious harm that existed on or about December 26, 2021, to detainees/inmates, including Gabriel Yalartai, to be injured as a result of the unconstitutional conditions at the OCDC.

24. On December 26, 2021, Defendant Kight was assigned to work the 12th

floor housing unit of the OCDC. His shift began at approximately 6:00 p.m. on Christmas Day, and upon information and belief, Defendant Kight's shift was scheduled for 12 hours and ended at 6:00 a.m. on December 26, 2021.

25. At approximately 4:20 a.m. on December 26, 2021, Defendant Kight was feeding 12 Charlie Pod when he attempted to feed Gabriel Yalartai. Defendant Kight opened the bean hole to the cell and placed Gabriel Yalartai's food tray into the cell and waited for a response. After Gabriel Yalartai failed to respond or take possession of his breakfast tray, Defendant Kight began looking in the cell for Gabriel Yalartai and found him hanging from the vent above the toilet with a piece of inmate clothing wrapped around his neck. Defendant Kight then radioed for assistance, and Gabriel Yalartai was eventually cut down from the vent and placed on the ground. The charge nurse, Brenda Pierce, RN, arrived on the scene immediately after CPR was attempted. Nurse Pierce pronounced Gabriel Yalartai deceased based on the fact that he had no detectable pulse, was not breathing, his skin was cold to the touch, and rigor mortis had already started to set in.

26. Gabriel Yalartai was pronounced deceased at 4:28 a.m. on December 26, 2021.

27. According to multiple internal investigations conducted by the OCDC, the last confirmed signs of life of Gabriel Yalartai occurred at 5:03 p.m. from the prior day when Gabriel Yalartai attempted to place a phone call from his cell. The last visible

signs of life were at 4:54 p.m., when OCDC employee Sgt. Sowards was seen on surveillance cameras feeding Gabriel Yalartai by handing him his dinner tray into the cell.

28. Pursuant to state law and the policies and procedures established by the BOCC and OCCJA, 12 Charlie Pod (wherein Gabriel Yalartai was been housed during his detainment) requires thirty (30) minute sight checks of all inmates assigned to "mental health status" to ensure inmate safety and to prevent adverse events for involving inmates who require mental health services.

29. Following the incident described in the preceding paragraphs, Investigator Daniel Lazar, employed by the OCCJA as a Criminal Investigator, reviewed and investigated the circumstances and facts surrounding Gabriel Yalartai's death. Based on his investigation, Investigator Lazar found that Defendant Kight was required to perform thirty (30) minute sight checks on all cells on the jail's 12th floor. He further reported that Defendant Kight abandoned his post at 12:06 a.m. on December 26, 2021, and did not return to the pod until 3:02 a.m. Furthermore, there were zero sight checks performed by Defendant Kight at any time throughout the duration of his shift. Accordingly, there is no evidence that any sight check was performed on Gabriel Yalartai from 5:03 p.m. on December 25, 2021, until he was found dead in his cell at approximately 4:28 a.m. on December 26, 2021.

30. The complete lack of sight checks was verified by Investigator Lazar based upon his review of the Avigilon Surveillance Camera System for the times

referenced in the preceding paragraph.

31. Upon further investigation, Investigator Lazar also discovered that Defendant Kight forged the jail's sight check logbooks to make it appear that regular sight checks had in fact occurred. This was also confirmed by camera surveillance footage that Defendant Kight performed a criminal act by forging official documentation.

32. Based upon Defendant Kight's conduct, Defendant Kight was charged by the Oklahoma District Attorney's Office with one felony count of willfully and knowingly falsifying the records required for inmate welfare checks by recording false time logs while acting under the authority of the OCCJA.

33. Defendant Kight was also charged with willfully and intentionally failing to make required inmate welfare checks on inmates held in the custody of the Oklahoma County Detention Center, contrary to the provisions of Section 581 of Title 21 of the Oklahoma Statutes.

34. As a result of the criminal charges alleged in Paragraphs 32-33, above, Defendant Kight pled guilty to the charges filed against him and received a three (3) year deferred sentence with supervision to be performed by the Department of Corrections' Probation and Parole Board.

35. Defendant Kight's conduct in failing to perform sight checks in accordance with the known pattern and practices of the OCDC had been known for many years in advance of the death of Gabriel Yalartai and had been widely investigated by the DOJ and

widely reported in the news. Despite these risks and prior acts of failing to protect inmates due to these known risks, the OCDC continues to implement the same policies and procedures that allow these incidents to occur.

36. Prior to the incident that is the subject matter of this Complaint, the Oklahoma State Department of Heath inspected the OCDC on June 23, 2021, and found the OCDC to have established a pattern of "REPEAT DEFICIENCY" in the administration of the OCDC sight check policy. Specifically, a review of 25-unit logbooks for June 19-23 revealed sight checks were not performed and documented **"in all 25-unit logbooks."**

37. Also prior to the death of Gabriel Yalartai, the Oklahoma State Department of Health conducted an additional inspection of the OCDC on October 22, 2021. During its inspection, inspectors found the OCDC to be **in continued non-compliance** since their last visit on June 23, 2021, and that a total of thirteen (13) thirty (30) minute sight checks were missed during a single day in October of 2021.

38. The Oklahoma State Department of Health inspected the OCDC again following the death of Gabriel Yalartai, and its investigation found that over a three (3) day period in April of 2022, one-hundred and four (104) sight check log entries were missed, and that seventy-two (72) of the one-hundred and four (104) sight checks were missed during the morning watch hours from 6:00 p.m. to 6:00 a.m., where minimal staff were assigned. To date, Defendants BOCC and OCCJA have done nothing to alleviate the repeated deficiencies that they have been found to be in non-compliance

9

with.

39. The pattern of acquiescence and deliberate indifference on the part of BOCC and OCCJA in the face of constitutional violations was so persistent and widespread as to constitute a policy and common procedure and to have the effect and force of law.

## FIRST CAUSE OF ACTION - VIOLATIONS OF 42 U.S.C. § 1983
### (Fourteenth Amendment of the U.S. Constitution)

40. Plaintiff re-alleges and incorporates Paragraphs 1 through 39 herein as if fully set forth.

41. A government official violates a pretrial detainees' Fourteenth Amendment right to medical care when the official acts with deliberate indifference to a pretrial detainees' serious medical needs. Officials act with deliberate indifference to serious medical needs when (i) the officials are aware of underlying facts indicating a substantial risk of serious harm exists and (ii) the officials must also draw the inference.

42. Deliberate indifference to serious medical needs can be established by the refusal to treat an inmate, ignoring medical complaints, intentionally incorrect medical treatment, or any similar conduct that would clearly evince a wanton disregard for any medical needs (including sight checks for medical safety). Further, the denial of recommended medical treatment is often sufficient to show deliberate indifference, or sufficient exceptional circumstances evincing such a disregard for the inmates' basic medical needs.

43. Defendants were aware of Gabriel Yalartai's serious medical needs, and need for medical supervision, as can be shown by an "Order of Commitment" that was entered by the District Court of Oklahoma on August 27, 2020. As clearly evidenced by the Order, Gabriel Yalartai was deemed to be mentally incompetent to stand trial for the charges that led to his confinement at the OCDC. The OCDC was in possession of said Order which was in Gabriel Yalartai's OCDC's file at the time Gabriel Yalartai was confined. Regular thirty (30) minute sight checks were required for Gabriel Yalartai's safety but did not occur for approximately eleven (11) hours prior to him being found dead in his cell.

44. The Defendants BOCC and OCCJA, individually and in concert, had knowledge of, and were deliberately indifferent in violation of the Fourteenth Amendment to the U.S. Constitution, to the following:

    i. The ongoing pattern and practice of constitutional violations at the OCDC, which had been disclosed by various investigations and inspections before Gabriel Yalartai's death;
    ii. The ongoing failure to implement adequate policies, guidelines and procedures to reasonably ensure the safety of detainees like Gabriel Yalartai;
    iii. Failure to follow the OCDC policies, guidelines and procedures regarding mental health status inmates;
    iv. Failure to adequately monitor and supervise access to cells from inmates by roving officers;
    v. Failure to properly ensure adequate sight checks were being performed as required by OCDC policy;
    vi. Failure to properly staff, train, and supervise the OCDC to meet the medical needs of the inmates who are confined there;
    vii. Failure to properly assign duties to the detention officers in charge of the care, custody and control of detainees;
    viii. Failure to properly monitor the supervisors of the OCDC;

    ix. Failure to correct known deficiencies in the OCDC's operation, policies and procedures; and

    x. A failure to protect from harm, which violates the right to receive adequate medical care and supervision at all times.

45. The actions of Defendants BOCC and OCCJA created a known and substantial risk of serious harm. Under the totality of the circumstances, the Defendants' pattern of action toward detainees, and inmates, including Gabriel Yalartai, due to Defendants BOCC and OCCJA's lack of properly trained staff and their failure to supervise resulted in deliberate indifference to the known substantial risk of serious harm and grave injuries to Gabriel Yalartai, which violated his constitutionally protected rights and proximately caused his injuries.

46. The BOCC, as the final decision-makers on funding, and the OCCJA, as final decision-makers on policies and procedures, hiring, training and supervision, combined to violate Gabriel Yalartai's constitutional rights as their decisions led to hiring unqualified jailers, like Defendant Kight, who in turn have, on more than one occasion, made deliberate actions that harm and seriously injure inmates at the OCDC as previously described.

47. All of the Defendants' acts and omissions constitute a deliberate indifference to Gabriel Yalartai's care, custody and safekeeping. Their acts and omissions proximately caused Gabriel Yalartai's injuries and violated his rights under the Fourteenth Amendment to the United States Constitution, which is cognizable under 42 U.S.C. § 1983.

48. Defendant Kight, acting under color of state law, deprived Gabriel Yalartai of his clearly established constitutional right under the Fourteenth Amendment of the Constitution of the United States to receive adequate medical care and treatment while being detained by the OCDC. Defendant Kight's deliberate indifference is evidenced by his guilty plea to felony charges regarding the same. Defendant Kight is liable individually and in his official capacity for said constitutional violations.

49. All of said constitutional violations were the direct and proximate cause of the death Gabriel Yalartai.

## SECOND CAUSE OF ACTION – PUNITIVE DAMAGES

50. The actions of all Defendants were deliberate, willful, wanton and malicious, and taken in reckless and intentional disregard of the rights of Gabriel Yalartai, thereby entitling Plaintiff to an award of punitive damages in an amount sufficient to deter the Defendants, and others similarly situated, from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Harmon D. Yalartai, as Personal Representative for the Estate of Gabriel Yalartai, prays for judgment against the Defendants, jointly and severally, as follows:

A. For an award of compensatory damages in an amount in excess of $75,000.00

B.    For an award of punitive damages in an amount in excess of $75,000.00

C.    For reasonable attorneys' fees, the costs of this action, interest as provided by law, and for all other relief this Court deems just and proper.

Respectfully submitted,

/s/ Nick Larby
Nick Larby, OBA No. 21734
LARBY & ASSOCIATES
9140 S. Braden Ave., Suite E
Tulsa, Oklahoma 74137
Telephone: (918) 796-5780
Facsimile: (918) 514-6178
nick@tulsalegalfirm.com

&

T. Luke Abel, OBA No. 21094
ABEL LAW FIRM
900 N.E. 63rd St.
Oklahoma City, Oklahoma 73105
Telephone: (405) 239-7046
Facsimile: (405) 418-0833
label@abellawfirm.com
**ATTORNEYS FOR PLAINTIFF**

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**